UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

DANIELLE Y. LINDEMER,                        Case No. 18-CV-3008 (PJS/LIB)

                    Plaintiff,

v.                                                              ORDER

POLK COUNTY and POLK COUNTY
SOCIAL SERVICES,

                    Defendants.

Kelly A. Jeanetta, KELLY A. JEANETTA LAW FIRM, LLC, for plaintiff.

Margaret A. Skelton and Frank Edward Langan, RATWIK ROSZAK & MALONEY, P.A.; Timothy S. Christensen, ZIMMERMAN REED LLP, for defendants.

Plaintiff Danielle Lindemer was employed as a social worker by defendant Polk County.[1]  When she was hired, Lindemer was told that her probationary period would last six months.  Shortly after starting her job, Lindemer took maternity leave—and then, shortly after returning from maternity leave, Lindemer began taking intermittent military leave to fulfill obligations with the North Dakota National Guard.  While

---

[1]Lindemer has also named "Polk County Social Services" as a defendant.  But Polk County Social Services is merely a department of Polk County; it cannot sue or be sued in its own name.  The Court therefore dismisses Polk County Social Services from this case.  *See Traylor v. Hennepin Cty. Adult Det. Ctr.*, No. 15-CV-2816 (JNE/TNL), 2016 WL 3647779, at *4 (D. Minn. May 27, 2016), *R&R adopted*, 2016 WL 3647849 (D. Minn. July 1, 2016).

Lindemer was out on military leave, the County decided to extend her probationary period by six months.

A few months later, Lindemer was called up for two months of emergency active duty with the North Dakota National Guard.  Soon after returning from active duty, Lindemer informed the County that she was (once again) pregnant and that she would (once again) be taking maternity leave.  The County (once again) extended her probationary period.

According to Lindemer, immediately after she informed her supervisor of her second pregnancy and her need to take a second maternity leave, her relationship with her supervisor soured, and her supervisor for the first time began criticizing Lindemer's communication skills.  A couple of months later, at the end of a meeting intended to address Lindemer's alleged difficulty in communicating, Lindemer confronted the County about the two extensions of her probationary period, arguing that the extensions had not been authorized by law.  A few days later, Lindemer was fired.

Lindemer now brings claims against the County alleging sex discrimination in violation of Title VII and the Minnesota Human Rights Act ("MHRA"); interference with her rights under the Family and Medical Leave Act ("FMLA"); violation of the Minnesota Whistleblower's Act ("MWA"); and violation of two Minnesota statutes that protect servicemembers.  The County moves for summary judgment on all claims.  For

the reasons that follow, the Court denies the County's motion, except insofar as it seeks

dismissal of the claims under the servicemember-protection statutes.

## I.  BACKGROUND

The facts, taken in the light most favorable to Lindemer, are as follows:

Polk County offered Lindemer a position as a social worker in November 2015.

Def. Ex. H; Def. Ex. D at 15.  At that time, new social workers were subject to a six-

month probationary period.  *See* Def. Ex. E at 1, 4.  Lindemer was told that the County's

policy would be changing effective January 4, 2016—and that, starting January 4, all

new social workers would be subject to a one-year probationary period.  Def. Ex. A

at 26–27.  Lindemer was scheduled to start work on January 4, but she was informed by

her supervisor (Molly Paulsrud) that "since [she] was offered the position prior to the

policy change . . . [she] would be grandfathered into the old policy."  *Id.* at 26; *see also*

Def. Ex. D at 16–17.  In other words, Lindemer was assured that her probationary

period would be six months.[2]

Lindemer initially worked out of the County's East Grand Forks office, as it was

near her home.  Def. Ex. A at 9, 31–32.  The East Grand Forks office was a "satellite

---

[2]In addition to Paulsrud's oral commitment, Lindemer also received various
documents from the County indicating that her probationary period was six months.
*See, e.g.*, Def. Exs. I, J.  In fact, at one point the Minnesota Department of Human
Services specifically asked the County about the length of Lindemer's probationary
period, and the County responded that the period was six months.  Pl. Ex. D.

office"; the County's main office was in Crookston, where Lindemer's supervisor (Paulsrud) worked.  *Id.* at 31–33.  Although they worked in different offices, Paulsrud and Lindemer met on a weekly or biweekly basis.  *Id.* at 31; Def. Ex. D at 38, 41–42. These meetings, or "coaching sessions," allowed Paulsrud and Lindemer to discuss Lindemer's cases and gave Paulsrud an opportunity to give Lindemer feedback on her performance.  *See, e.g.*, Def. Ex. D at 38, 73–74.

About two months after starting her job, Lindemer took 12 weeks of unpaid maternity leave (from March 7, 2016, until May 30, 2016).  Def. Exs. I, J.  Lindemer's maternity leave was considered a general leave of absence, and thus the end date of her probationary period was pushed out 12 weeks—from July 4, 2016, to September 27, 2016.  Def. Exs. I, J, K.  Lindemer has never challenged the lawfulness of this extension of her probationary period.

Lindemer received her first formal performance evaluation from Paulsrud on July 11, 2016, which was about a month after she returned from maternity leave.  Def. Ex. L.  Lindemer was rated on eight categories of job skills; for each category, Lindemer received one of three possible ratings: "satisfactory," "needs improvement," or "not satisfactory."  *Id.*  Lindemer's communication skills and interpersonal skills were both rated as "satisfactory."  *Id.*  Indeed, Lindemer received "satisfactory" marks for all categories save for job knowledge and productivity, which Paulsrud rated as "needs

improvement." *Id.* In the comment section of the performance evaluation, Paulsrud noted that Lindemer should continue to complete tasks on her orientation schedule so that she could continue to gain job knowledge. *Id.* Paulsrud also noted that Lindemer could improve her productivity by finding a good documentation method. *Id.*

Shortly after receiving her first performance evaluation, Lindemer began to take intermittent military leave to fulfill her obligations with the North Dakota National Guard. Lindemer was out on military leave three days in July 2016 and five days in August 2016. Def. Ex. P. While Lindemer was out on military leave at the end of August, Paulsrud decided to extend her probationary period by six months. Def. Exs. N, P. Paulsrud reminded Lindemer that the County had changed its policy to require a one-year probationary period for new social workers and said that "there has not been enough work assigned/completed" to enable Paulsrud to determine whether Lindemer has "satisfactor[ily] complet[ed]" her "current six month probationary period." Def. Ex. O. The six-month extension moved the end of Lindemer's probationary period to March 27, 2017. *See, e.g.*, Def. Ex. V.

After Lindemer returned from military leave at the end of August, she received her second formal performance evaluation. Def. Ex. O. All of the ratings were the same. Once again, Lindemer was rated "satisfactory" on all categories (including communication skills and interpersonal skills), except that she was rated "needs

improvement" with respect to job knowledge and productivity.  *Id.*  The second

evaluation repeated many of the same comments as the first evaluation—i.e., about

Lindemer gaining job knowledge by completing the tasks on her orientation schedule,

and about her improving her productivity by finding a documentation method that

worked for her.  *Id.*  Paulsrud also noted some "concern with the amount of work

assigned versus the completion of work and cases."  *Id.*

Following her second performance evaluation, Lindemer continued to take

sporadic military leave, missing another four days of work in September 2016.  Def.

Ex. P.  In December 2016, Lindemer notified the County that her National Guard unit

had been activated for emergency service (specifically, to help provide security in

connection with the protests over the Dakota Access Pipeline).  Def. Ex. A at 52, 99; Def.

Ex. Q.  Lindemer would thus be taking extended military leave from January 2, 2017, to

February 17, 2017.  Def. Ex. Q.

On March 9, 2017—a couple of weeks after Lindemer returned from her

extended military leave—Lindemer met with Paulsrud for one of their weekly coaching

sessions.  After discussing her cases, Lindemer brought up the FMLA.  Def. Ex. A

at 137–38.  Paulsrud "interrupted [Lindemer] and asked, 'Are you going to need to be

using FMLA?'" *Id.* at 138.  Lindemer answered affirmatively, disclosing that she was

again pregnant and would again need to take maternity leave.  *Id.*  Paulsrud's

"demeanor immediately changed." *Id.* "She went from smiling and pleasant and happy to a stern look on her face." *Id.* Paulsrud asked Lindemer how much leave she would need, and Lindemer responded that she intended to take all of the leave to which she was entitled. *Id.* Paulsrud told Lindemer that she was entitled to 12 weeks and then ended the meeting. *Id.* Leaving Paulsrud's office, Lindemer "did not have a good feeling," because although "[t]he meeting started very, very well . . . everything changed when [she] told [Paulsrud] that [she] was pregnant and needed leave again." *Id.* at 138–39. After returning to her cubicle, Lindemer told her coworkers that she was pregnant, and one responded: "Oh, my God, are you ever going to work here?" *Id.* at 139.

Paulsrud went on vacation after meeting with Lindemer on March 9. Def. Ex. A at 139. Soon after returning to work on March 20, Paulsrud met again with Lindemer and informed her—for the first time—that she "just ha[s] a feeling that [Lindemer] ha[s] an issue with communication." *Id.* at 141; *see also id.* at 75. Paulsrud also told Lindemer that they would meet again to discuss this "issue," and that, at that meeting, Paulsrud would "have more detail." *Id.* at 75.

The followup meeting took place on March 23, 2017. At that meeting, Paulsrud provided Lindemer with her third formal performance evaluation. Pl. Ex. R. For the first time, Paulsrud rated Lindemer's "communication skills" as "needs improvement."

Pl. Ex. R.  (Lindemer's "interpersonal skills" were still rated as "satisfactory."  *Id.*)  In the comment section, Paulsrud noted that she had "identified a concern with [Lindemer's] communication."  *Id.*  Paulsrud said that her "expectation" was that Lindemer will "use appropriate communication with supervisor,[3] co-workers/ collaterals and clients."  *Id.*  Paulsrud listed using "[a]ppropriate tone" and "listen[ing] to feedback" as areas that needed improvement.  *Id.*[4]

At the March 20 meeting, Lindemer asked Paulsrud if anyone had complained about her, and Paulsrud said "no."  Def. Ex. A at 73; Def. Ex. U at 00253.  At the March 23 meeting, however, Paulsrud told Lindemer that "collaterals and co-workers [had] made complaints."  *Id.*  Paulsrud provided no details, and Lindemer did not discover the nature of those complaints until after she filed this lawsuit.  There were two complaints:

---

[3]Paulsrud had been Lindemer's supervisor since Lindemer started working for the County in January 2016.  The two communicated frequently and met in person every week or two.  Yet Paulsrud never expressed concern about the way that Lindemer communicated until after Lindemer disclosed her pregnancy on March 9.  Following that disclosure, however, Paulsrud seemed to focus on Lindemer's communication style.  Paulsrud began taking notes at their meetings, writing that Lindemer's "communication was rough" and that "her style" is "defensive and almost rude."  Def. Ex. U at 00252.

[4]Paulsrud was vague in explaining to Lindemer why her communication skills were an area of concern.  Paulsrud told Lindemer that she "wasn't using poor communication skills all the time.  It was just some of the time."  Def. Ex. A at 106.  This left Lindemer "unclear as to when those 'sometimes' were," as she "felt that [her] tone and ability to listen to feedback was consistent through [her] employment."  *Id.*

First, on March 1 (eight days before Lindemer disclosed that she was pregnant), Paulsrud was told by one of the other social workers that a Crookston police officer named Travis Halvorson had said that he did not want to work with Lindemer.  Def. Ex. D at 79–81.  Paulsrud reached out to Halvorson, who told her "that he didn't think very highly of [Lindemer's] work" and he did not want to work with her.  *Id.* at 81–82.  Paulsrud does not appear to have pressed Halvorson for specifics, as she did not know how many times Lindemer and Halvorson had worked together or what exactly Halvorson did not like about Lindemer's work.  *Id.* at 83–84.  The only comment that Halvorson apparently made about Lindemer's communications was that he could tell that she was in the military based on how she communicated.  *Id.* at 82.  Paulsrud did not know what Halvorson meant by this, and Paulsrud herself did not believe that someone could tell that Lindemer was in the military based on how she communicated. *Id.* at 82–84, 94.

Second, on March 9, shortly after Paulsrud's meeting with Lindemer ended, one of Lindemer's coworkers approached Paulsrud to tell her about an incident that she had observed in December.  Def. Ex. D at 84–85.  According to Paulsrud, the coworker indicated that "she was shadowing [Lindemer] and did not like the way [she] was treating a child victim in one of her cases."  *Id.* at 84.  Specifically, Lindemer was "rude and rough" with the teenager.  Def. Ex. U at 00252.

Purportedly because of these two complaints, Lindemer was reassigned to the Crookston office "to allow opportunity for growth and change while being able to have increased interaction with supervisor and team to successfully complete probation."  Pl. Ex. R.  Her probationary period was once again extended, this time for three months. *Id.*

In response to Paulsrud's concerns, Lindemer sought advice about her communication skills.  After a difficult meeting with a client on April 19, 2017, Lindemer reached out to Paulsrud for advice.  *See* Def. Ex. X.  Lindemer had visited the client's home with two colleagues, Rachelle Haga (the case manager) and Val Bower (a family-based worker).  *Id.*; Def. Ex. A at 81–82.  Lindemer found that there was medical neglect of a child due to malnutrition.  Def. Ex. A at 81.  The child's mother was upset by Lindemer's finding.  *Id.* at 82.  After the meeting, as the group was driving back to the office, Haga told Lindemer that she thought that Lindemer had handled the meeting poorly.  *Id.* at 84.  Haga believed that Lindemer was "putting off negative vibes and that [she] was mean because [she] made a maltreatment determination."  *Id.* at 89.  When Paulsrud asked Haga about the meeting, Haga said that Lindemer had been "aggressive" and "angry."  Def. Ex. U at 00257.  When Paulsrud pressed Haga for specifics, however, Haga told Paulsrud that she had not been "listening to the details of [Lindemer's conversation with the family]."  *Id.*

Bower disagreed with Haga's assessment.  Bower thought that the meeting went fine and that Lindemer "did absolutely nothing wrong."  Def. Ex. A at 85.  In fact, Bower thought that *Haga* "acted inappropriately during th[e] meeting" and *Lindemer* "handled it correctly."  *Id.*  The only criticism that Bower expressed about Lindemer was that she "could maybe have used more empathy when addressing the family."  Def. Ex. U at 00256.

About a week later, Paulsrud reached out to another coworker of Lindemer's because that coworker "had mentioned a communication problem with [Lindemer] two weeks ago."  Def. Ex. U at 00259-60.  It turned out this "communication problem" was "confusion" about who was supposed "to line up a volunteer driver."  *Id.*  Paulsrud pressed the coworker about whether there were "any other concerns with [Lindemer's] communication."  *Id.*  The coworker responded that she had no such concerns and, in fact, that Lindemer and she had "worked really good together and yesterday[] [Lindemer] was nicer to their mutual client than she . . . was."  *Id.*  She added that "she ha[d] worked several difficult cases with [Lindemer] and" found her to be "helpful."  *Id.*[5]

---

[5]This is consistent with Lindemer's testimony that her coworkers could not understand why Paulsrud thought she had a problem with communications.  *See* Def. Ex. A at 121–24.

On May 3, 2017, Lindemer was summoned to a meeting with Paulsrud and Paulsrud's supervisor (Kent Johnson). Def. Ex. A at 100–01, 107. Johnson arranged the meeting after Paulsrud told him that she was concerned about Lindemer's communications. Def. Ex. C at 39–40, 42–45. During the meeting, Paulsrud discussed her expectations for Lindemer. Def. Ex. D at 104–05. Johnson later testified that he did not "see a lot of good communication going on" between Paulsrud and Lindemer during the meeting. Def. Ex. C at 46. He believed that Lindemer was giving "[s]hort answers and seemed defensive," and that her "posture" was "upright." *Id.* at 48–49.

At the end of the meeting, Lindemer was asked if she had any questions, and she responded by asking why her probationary period had been extended twice,[6] and what gave the County legal authority to extend her probationary period as it had. Def. Ex. U at 00260-61; Def. Ex. A at 107. Johnson said that he did not know, but that he would look into it. Def. Ex. U at 00260-61; Def. Ex. A at 107. Lindemer was also asked to talk to Becky Kofoed, the County's human-resources director. Pl. Ex. S.

---

[6]Lindemer's probationary period had actually been extended three times: (1) her probationary period was extended by 12 weeks after she took 12 weeks of maternity leave in early 2016; (2) her probationary period was extended by six months while she was on intermittent military leave in late August 2016; and (3) her probationary period was extend by three months shortly after she disclosed her second pregnancy in early March 2017. As noted, Lindemer has never challenged the lawfulness of the first extension.

Lindemer met with Kofoed on the following day and pressed her about the source of the County's authority to extend Lindemer's probationary period.  Def. Ex. B at 93–94; Def. Exs. Z, AA.  Lindemer pointed out that the rules of the Minnesota Merit System allowed an employer to extend an employee's probationary period only once, and for no more than three months.  Def. Ex. A at 113–14.  Lindemer questioned how the County was able to extend her probationary period twice—first for six months, and then for three months.  *Id.*  Kofoed told Lindemer that she "perceive[d]" the rule differently.  *Id.* When Lindemer asked Kofoed to explain her "perception," Kofoed accused Lindemer of "trying to trick her into making statements that [she] wanted to hear."  *Id.* at 114.  Kofoed testified that she found Lindemer "accusatory" and that Lindemer exhibited frustration by aggressively "whipping through" her personnel file during the meeting.  Def. Ex. B at 114–16.

A couple of days later—after Kofoed had consulted with an attorney—Kofoed told Lindemer that her initial probationary period had been one year, because she had started work on January 4, 2016 (the date on which the County's new policy took effect).  Def. Ex. AA.  Thus, said Kofoed, Lindemer's probationary period had been extended only once (in March 2017) and only for three months.  *Id.*  That, of course, was not true. When Lindemer started work for the County, she was repeatedly told—orally and in writing—that she would be grandfathered in under the old policy, and that her

probationary period would be only six months.  *See* Def. Ex. A at 26; *see also* Def. Ex. D at 16–17; Def. Exs. I, J.

While Kofoed was looking into Lindemer's challenge to the legality of the extensions of her probationary period, Paulsrud emailed Johnson a recommendation that Lindemer be fired.  Def. Ex. BB.  Shortly thereafter, Kofoed too recommended that Lindemer be fired.  Def. Ex. C at 51–52.  Johnson accepted their recommendations and fired Lindemer on May 12, 2017.  Def. Ex. CC.[7]  Kofoed notified Lindemer of her termination by letter, explaining that Lindemer was being fired because she had not "show[n] significant improvement in [her] communication."  *Id.*

In this lawsuit, Lindemer alleges that her termination violated Title VII, the MHRA, the FMLA, the MWA, and two Minnesota statutes that protect members of the military.  The County moves for summary judgment on all claims.

---

[7]It appears that Johnson made the ultimate decision to fire Lindemer, but that he acted at the behest of Paulsrud and Kofoed.  As the Court will explain, a reasonable jury could find that, in urging Johnson to fire Lindemer, Paulsrud was motivated by Lindemer's pregnancy and request for FMLA leave, and Kofoed was motivated by Lindemer's whistleblowing.  Thus, whether or not Johnson personally acted with a discriminatory motive, a jury could find the County liable on a "cat's paw" theory.  *See, e.g.*, *Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 551 (8th Cir. 2013) ("In a cat's paw case, an employer may be vicariously liable for an adverse employment action if one of its agents—other than the ultimate decision maker—is motivated by discriminatory animus and intentionally and proximately causes the action." (citation omitted)); *see also Chavez-Lavagnino v. Motivation Educ. Training, Inc.*, 767 F.3d 744, 750 (8th Cir. 2014) (concluding "that the Minnesota courts" would likely "apply the same analysis under the [MWA]").

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution

might affect the outcome of the suit under the governing substantive law.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if

"the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in [her] favor."  *Id.* at 255 (citation omitted).

### B.  Title VII and MHRA Claims

Lindemer first alleges that her termination violated Title VII and the MHRA.

Both Title VII and the MHRA prohibit discrimination on the basis of sex, and

discriminating against an employee because she is pregnant is a form of sex

discrimination.  *See* 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 2000e(k); Minn. Stat. § 363A.08,

subd. 2; Minn. Stat. § 363A.03, subd. 42.

"[S]ex discrimination claims under Title VII and the MHRA may be analyzed

simultaneously."  *Roberts v. Park Nicollet Health Servs.*, 528 F.3d 1123, 1127 (8th Cir. 2008)

(citation omitted).  To state a claim for sex discrimination, a plaintiff must show "that

sex (including pregnancy) was 'a motivating factor' for [her] discharge[.]" *Id.* (citations omitted). Where, as here, the plaintiff does not have "direct" evidence of such discrimination, the Court applies the burden-shifting framework of *McDonnell Douglas* to determine if the plaintiff has sufficient "indirect" evidence to survive a summary-judgment motion. *Id.*; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).

Under *McDonnell Douglas*, Lindemer must first present a prima facie case of discrimination. *Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1038 (8th Cir. 2010). Specifically, Lindemer must show: (1) that she is a member of a protected class; (2) that she was qualified for her position;[8] (3) that she suffered an adverse employment action; and (4) that the adverse employment action took place under circumstances giving rise to an inference of discrimination. *Id.* The County disputes the fourth prong—that is, whether Lindemer's termination took place under circumstances giving rise to an inference of sex discrimination.

_____

[8]The parties disagree about whether, to meet the second prong of the prima facie case, Lindemer must show merely that she was qualified for the position, or instead must show that she was meeting the legitimate expectations of her employer. *See* ECF No. 24 at 17–19; ECF No. 26 at 22–23; ECF No. 29 at 8–9. The Court agrees with Lindemer that she is required to show only that she was qualified for her position, and that she has easily met that requirement. *See, e.g., Riley v. Lance, Inc.*, 518 F.3d 996, 1000 (8th Cir. 2008); *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 874 n.2 (8th Cir. 2007); *Arnold v. Nursing & Rehab. Ctr. at Good Shepard, LLC*, 471 F.3d 843, 846 (8th Cir. 2006); *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 944 (8th Cir. 1994).

If Lindemer presents a prima facie case, then the burden shifts to the County to put forth a legitimate, nondiscriminatory explanation for its decision to terminate Lindemer. *Id.* The parties agree that the County has done so by claiming that Lindemer was fired because she did not meet the expectations of her supervisor—particularly with respect to her ability to communicate.

Finally, the burden shifts back to Lindemer to show that the County's explanation is pretextual. The County disputes that a reasonable jury could find that its proffered explanation for Lindemer's firing was pretextual.

Here, Lindemer relies on the same evidence to establish both the fourth prong of the prima facie case and the pretextual nature of the County's explanation. In particular, Lindemer points to (1) the temporal proximity of her termination to her disclosure of her second pregnancy;[9] (2) Paulsrud's instant and negative reaction to that disclosure; (3) Paulsrud's sudden "feeling" that Lindemer had a "problem" with

---

[9]The County argues that "timing," or temporal proximity, is not a relevant consideration in *discrimination* cases. Instead, says the County, it is relevant only in *retaliation* cases. ECF No. 24 at 19–20. This is simply not true. *See, e.g.*, *Moysis v. DTG Datanet*, 278 F.3d 819, 826 (8th Cir. 2002) (stating, in a disability-discrimination case, that "suspicious timing can support a finding of discrimination" (citation omitted)); *see also, e.g.*, *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 108 (2d Cir. 2019) (finding that a plaintiff could rely "on the temporal proximity between the time she disclosed her pregnancy and her termination to establish an inference of unlawful discrimination"); *Asmo v. Keane, Inc.*, 471 F.3d 588, 594 (6th Cir. 2006) ("[T]emporal proximity between the employer's learning of an employee's pregnancy and an adverse employment action taken with respect to that employee likewise may be 'indirect evidence' in support of an inference of pregnancy discrimination[.]").

"communication"—a problem that went unmentioned until their first meeting after Lindemer's disclosure of her pregnancy; and (4) the paucity of evidence supporting Paulsrud's concern about Lindemer's ability to communicate.  *See* ECF No. 26 at 23–27.

The first circumstance to which Lindemer points—the temporal proximity of her termination to the disclosure of her second pregnancy—does not help her much. Lindemer told Paulsrud that she was pregnant on March 9, 2017; Lindemer was not fired until about two months later.  It is clear, under Eighth Circuit precedent, that the termination was not sufficiently close in time to the disclosure to establish an inference of discrimination.  *See, e.g.*, *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002) (finding that an employee's termination 13 days after her protected activity was "sufficient, but barely so, to establish causation" for purposes of her prima facie case); *see also Morris v. City of Chillicothe*, 512 F.3d 1013, 1019–20 (8th Cir. 2008) ("[T]he fact that a plaintiff is terminated after engaging in a protected activity is not sufficient to support an inference of pretext, even though temporal proximity may sometimes be enough to get a plaintiff past the prima facie stage." (citation omitted)).

Lindemer's other evidence is more compelling.  Lindemer testified that Paulsrud displayed obvious annoyance with Lindemer immediately after hearing that she was pregnant.  According to Lindemer, Paulsrud's "demeanor immediately changed . . . . She went from smiling and pleasant and happy to a stern look on her face."  Def. Ex. A

at 138.  Paulsrud congratulated Lindemer "in a monotone voice" and then

"immediately asked [Lindemer] how much leave [she] was planning on taking."  *Id.*

After learning that Lindemer was planning to take the maximum leave to which she

was entitled (12 weeks), Paulsrud abruptly ended the meeting.  *Id.*[10]

At their very next meeting, Paulsrud informed Lindemer that she had a

communications problem.  Despite the fact that Lindemer had been employed by the

County for 14 months and had met with Paulsrud on a weekly or biweekly basis to

receive coaching and feedback, Paulsrud never once mentioned any concern about

Lindemer's ability to communicate.  To the contrary, in her two formal evaluations of

Lindemer, Paulsrud had rated Lindemer's communication skills as "satisfactory"—the

---

[10]There is other evidence from which a jury could find that Paulsrud was
frustrated by Lindemer's frequent absences, two of which (one taken, one planned)
were maternity leaves.  Paulsrud extended Lindemer's probationary period by
12 weeks after she took her first maternity leave.  Paulsrud extended Lindemer's
probationary period a second time when she was out on intermittent military leave in
late August 2016.  Then, during Lindemer's extended military leave in early 2017,
Paulsrud sent an email to a colleague stating that she anticipated that Lindemer's
"probation will [be] extend[ed] again" because "[s]he is currently on Military leave that
will turn into a general leave of absence for a period of time.  :/"  Pl. Ex. O.  Finally,
shortly after Lindemer disclosed her intent to take another maternity leave, Paulsrud
extended her probationary period a third time.

The colon followed by the backslash that Paulsrud included in her email is a
common "emoticon" expressing annoyance or discomfort.  *See* List of Emoticons,
Wikipedia, available at https://en.wikipedia.org/wiki/List_of_emoticons (last visited
August 6, 2020) (listing ":/" as an emoticon which expresses that an individual is
skeptical, annoyed, undecided, uneasy, or hesitant).

highest possible rating.  When pressed by Lindemer for specifics, Paulsrud had trouble

explaining the nature of Lindemer's communications problem.  As it turns out, there

was a reason why Paulsrud could not be specific:  Paulsrud had almost no evidence that

Lindemer actually had a communications problem.  Paulsrud appeared to be relying on

just two complaints:

First, Paulsrud had been told on March 1 that a single police officer (Officer

Halvorson) did not "think highly" of Lindemer's work and did not want to work with

her.  But a jury could find that Paulsrud was not terribly concerned about this report, as

she did not try to learn anything specific about the basis for Halvorson's opinion.  More

importantly, Halvorson did not complain about Lindemer's *communications*, except to

remark that he could tell that she was in the military based on the way that she

communicated.  Paulsrud did not know what Halvorson meant by this, and Paulsrud

did not share his opinion.

Second, a coworker complained to Paulsrud on March 9—sometime after

Lindemer and Paulsrud had met—that "in December . . . [the coworker] was shadowing

[Lindemer] and did not like the way [she] was treating a child victim in one of her

cases."  Def. Ex. D at 84.  Paulsrud never told Lindemer about this complaint, nor asked

her to respond.[11]

_____

[11]It appears that in January 2016—right after Lindemer started to work for the
(continued...)

After Paulsrud expressed concern about Lindemer's communications and moved Lindemer to the Crookston office, Lindemer sought Paulsrud's advice about a difficult meeting with a client.  Paulsrud spoke to the other two workers who were present at the meeting.  One thought that Lindemer handled the meeting well.  The other thought that Lindemer had been "aggressive" and "angry" during the meeting, but could not provide any specifics because she had not "listen[ed]to the details" of Lindemer's conversation with the family.  Def. Ex. U at 00257.

In sum:  (1) Paulsrud met with Lindemer regularly from January 2016 until March 2017 for the purpose of assessing her performance and giving her advice. (2) Paulsrud did not express a word of concern about Lindemer's communications; indeed, when formally evaluating Lindemer, Paulsrud assigned the highest rating possible to her communication skills.  (3) Lindemer disclosed her pregnancy to Paulsrud on March 9, 2017.  (4) Paulsrud immediately showed displeasure.  (5) At their next meeting, Paulsrud for the first time expressed concern about Lindemer's

---

(...continued)

County—a client complained that Lindemer was "cold, aloof, and argumentative."  Def. Ex. A at 58–59; Def. Ex. D at 44.  Paulsrud told Lindemer that this "client has done this previously"—i.e., complained about the social workers assigned to her case.  Def. Ex. A at 58–59.  Paulsrud did not hear any other complaints about Lindemer until March 2017—more than a year later.  Not surprisingly, the County has barely mentioned this incident in its briefing.

communications.  (6) That concern was expressed vaguely and was based on little or no evidence that Lindemer was in fact having trouble communicating.

In light of this evidence, Lindemer has established that she was terminated under circumstances that give rise to an inference of discrimination.  Moreover, a reasonable jury could find that the County's explanation for that termination is pretextual—and that the County was actually motivated by hostility to Lindemer on account of her pregnancy.  The County's motion for summary judgment on Lindemer's Title VII and MHRA claims is therefore denied.

## C.  FMLA Claim

Lindemer also claims that the County unlawfully interfered with her rights under the FMLA.  As a general matter, an employee is entitled to 12 weeks of unpaid leave after giving birth to a child.  *See Hasenwinkel v. Mosaic*, 809 F.3d 427, 431–32 (8th Cir. 2015).  The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]."  29 U.S.C. § 2615(a)(1).  The Eighth Circuit frequently refers to FMLA interference claims as "entitlement claims."  *See Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012) (discussing how the Eighth Circuit refers to "interference" claims as "entitlement" claims).

"The initial burden of proof in an FMLA interference case is on the employee to show only that he or she was entitled to the benefit denied." *Ballato v. Comcast Corp.*, 676 F.3d 768, 772–73 (8th Cir. 2012) (cleaned up; citations omitted).  If the employee meets this burden, the employer may avoid liability by establishing that it denied the benefit for "a reason unrelated to the employee's exercise of FMLA rights." *Id.* at 772. The County argues that (1) Lindemer has not met her initial burden of showing that she was entitled to a benefit under the FMLA, and that, even if she has, (2) her termination was unrelated to her request for FMLA leave.  The Court addresses the County's arguments in turn.

1.  Entitlement to an FMLA Benefit

To be entitled to FMLA leave, an employee must meet certain requirements.  For example, she must have worked the requisite number of hours; she must have provided her employer with proper notice; and she (or a relative) must suffer from a condition or experience an event that makes her eligible for FMLA leave.  The County argues that it could not have interfered with Lindemer's FMLA rights because at the time that she was terminated she had not yet given birth.  ECF No. 24 at 23.  The Court disagrees.

The FMLA broadly prohibits an employer from interfering with "the *attempt* to exercise[] any right provided under [the FMLA]."  29 U.S.C. § 2615(a)(1) (emphasis added).  If an employee informs her employer that she *intends* to take FMLA leave to

-23-

which she *will* be entitled—and then the employer fires her to prevent her from taking

that FMLA leave—the employer has "interfere[d]" with the employee's "attempt to

exercise" a right provided under the FMLA.  As the FMLA regulations make clear,

"[i]nterfering with the exercise of an employee's rights would include, for example . . . .

manipulation by a covered employer to avoid responsibilities under [the] FMLA," such

as "[r]educing hours available to work in order to avoid employee eligibility."  29 C.F.R.

§ 825.220(b)(3).  Firing an employee is just an extreme form of "reducing" an employee's

hours "to avoid employee eligibility."

 Other courts agree.  For example, in *Pereda v. Brookdale Senior Living Communities,*

*Inc.*, an employee (Pereda) informed her employer (Brookdale) that she was pregnant

and intended to take FMLA leave in five or six months.  666 F.3d 1269, 1271 (11th Cir.

2012).  Brookdale fired Pereda about two months later, long before she gave birth.  *Id.*

Pereda sued Brookdale for interfering with her rights under the FMLA.  *Id.*  The district

court dismissed her claim, finding that she was not eligible for FMLA leave at the time

that she was fired because she had not yet given birth.  *Id.* at 1272–73.

 The Eleventh Circuit reversed.  The court acknowledged that, at the time that

Pereda requested FMLA leave, she was not yet eligible for it, as she had not yet worked

the requisite number of hours and had not yet given birth.  *Id.* at 1272.  But it was

undisputed that Pereda would be eligible for FMLA leave by the time that her baby was

due.  *Id.*  The court analyzed the FMLA regulatory scheme—including the requirement

that an employee provide her employer with 30 days' notice of expected maternity

leave—and concluded that Pereda had stated an FMLA interference claim.  *Id.*

at 1273–75.  As the court explained, "[w]ithout protecting [an employee] against pre-

eligibility interference, a loophole is created whereby an employer has total freedom to

terminate an employee before she can ever become eligible.  Such a situation is contrary

to the basic concept of the FMLA."  *Id.* at 1273.  The court further noted that "'[i]t would

be illogical to interpret the notice requirement in a way that requires employees to

disclose requests for leave which would, in turn, expose them to retaliation, or

interference, for which they have no remedy.'"  *Id.* at 1274 (citation omitted).

The Court finds *Pereda* persuasive and holds that Lindemer was "entitled to the

benefit denied."  *Ballato*, 676 F.3d at 773.

### 2.  Connection Between Termination and Request for FMLA Leave

The County argues that, even if Lindemer met her initial burden of showing that

she was entitled to a benefit under the FMLA, the County's decision to terminate her

was unrelated to her request for FMLA leave.  ECF No. 24 at 23–24.  Thus, says the

County, it did not unlawfully interfere with Lindemer's rights under the FMLA.  *Id.*

The Eighth Circuit has often said that once a plaintiff establishes that she was

denied a benefit to which she was entitled under the FMLA, "the employer's intent is

immaterial." *Ballato*, 676 F.3d at 772.  At the same time, however, the Eighth Circuit has

emphasized that "the FMLA does not impose strict liability on employers for

interference claims."  *Id.*  Thus, the employer's intent may be relevant.[12]  Here, if the

County can establish that it terminated Lindemer for "a reason unrelated to [her]

exercise of FMLA rights," the County cannot be held liable for FMLA interference.  *Id.*

The County cites Lindemer's communications problem as its basis for firing her.

But, for reasons already explained, a jury could disbelieve the County and find that the

County was instead motivated by animus toward Lindemer's request for FMLA leave.

Accordingly, the Court denies the County's motion for summary judgment on

Lindemer's FMLA interference claim.

### D.  MWA

Lindemer next alleges that the County violated the MWA by firing her days after

she reported an apparent violation of the rules of the Minnesota Merit System in

connection with the extensions of her probationary period.  To state a claim under the

MWA, Lindemer must show that her termination was in retaliation for her "report[ing]

_____

[12]As one court has remarked, the "'legitimate, unrelated reason' carve-out or
exception has caused some confusion as to the role of the employer's intent in FMLA
interference claims."  *Jaszczyszyn v. Advantage Health Physician Network*, 504 F. App'x
440, 447 (6th Cir. 2012).  Courts frequently find themselves saying that intent is
irrelevant to FMLA interference claims, only to proceed to analyze the employer's
intent.  *See, e.g.*, *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 978–79 (10th Cir. 2017);
*Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 312 (3d Cir. 2012).

a violation, suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law to an employer . . . ."  Minn. Stat. § 181.932, subd. 1(1).

Lindemer does not have direct evidence of retaliation, and thus her claim is analyzed under the *McDonnell Douglas* framework.  *Elkharwily v. Mayo Holding Co.*, 823 F.3d 462, 470 (8th Cir. 2016).  Specifically, Lindemer must establish a prima facie case by showing that (1) she engaged in conduct protected by the MWA, (2) an adverse employment action was taken against her, and (3) there is a causal connection between her protected conduct and the adverse action.  *Id.*  If Lindemer establishes a prima facie case, the burden shifts to the County to articulate a legitimate reason for the adverse employment action (which, as noted, it has done).  *Id.*  If the County carries its burden, then the burden shifts back to Lindemer to submit evidence that is sufficient to allow a jury to find that the County's stated reason is pretextual.  *Id.*  The County argues that Lindemer has not shown a causal connection between her protected conduct and her firing, and the County disputes that a jury could find that the County's stated reason for terminating Lindemer was pretextual.

Lindemer alleges that the very close temporal proximity between her reporting a potential violation of the rules of the Minnesota Merit System and the County deciding to fire her establishes a causal connection sufficient to establish her prima facie case.

ECF No. 26 at 19–21.  The Court agrees.  *See, e.g.*, *Fezard v. United Cerebral Palsy of Cent. Ark.*, 809 F.3d 1006, 1012 (8th Cir. 2016) (holding that an employee's termination three days after her protected activity was sufficient to establish a causal connection for purposes of her prima facie case under *McDonnell Douglas*); *Smith*, 302 F.3d at 833 (holding that an employee's termination 13 days after her protected activity was "sufficient, but barely so, to establish causation" for purposes of her prima facie case under *McDonnell Douglas*).

The question, then, is whether a jury could find the County's explanation—that it fired Lindemer because of her inability to communicate—to be pretextual.  The Court has already explained why a jury could choose to disbelieve the County.  A jury could also find that Lindemer's whistleblowing was the reason why Kofoed recommended that she be terminated.  Kofoed appeared to be annoyed by the accusation that the County violated the rules of the Minnesota Merit System when it twice extended Lindemer's probation.  During their meeting, Kofoed found Lindemer "accusatory" and believed that Lindemer was "trying to trick her into making statements that [she] wanted to hear."  Def. Ex. B at 114; Def. Ex. A at 114.  Kofoed's defense of the County's actions—specifically, her claim that Lindemer's initial probationary period had been for one year, not six months—was either dishonest or badly mistaken.  Most importantly, within just a few days of Lindemer challenging the lawfulness of the County's actions,

Kofoed recommended that she be fired.  For these reasons, the County's motion for

summary judgment on Lindemer's MWA claim is denied.

### E.  Military Claims

Finally, Lindemer brings claims against the County under two Minnesota

statutes that are intended to protect members of the armed services.  The first statute

provides various protections to state employees who engage in certain types of military

service.  *See* Minn. Stat. § 192.261.  The second statute makes it a crime to discharge an

employee because of the employee's military service.  *See* Minn. Stat. § 192.34.

Unfortunately for Lindemer, however, neither statute helps her.

### 1.  Minn. Stat. § 192.261

Section 192.261 provides various protections for employees "of the state" who

"engage[] in active service . . . in any of the military or naval forces of the state or of the

United States . . . ."  Minn. Stat. § 192.261, subd. 1.  Lindemer claims that the County

violated the statute when it terminated her within one year of her return from active

military service without cause and without notice and a hearing.  *See* Minn. Stat.

§ 192.261, subd. 2.  The County argues (among other things) that § 192.261 does not

apply to Lindemer because her active military service was with the North

Dakota National Guard and not the Minnesota National Guard.  ECF No. 24 at 27–28.

The Court agrees.

-29-

As noted, § 192.261 provides certain protections to "employee[s] of the state" who engage in active military service. *See* Minn. Stat. § 192.261, subds. 1–2. The statute refers to "*the* state"—not to "*a* state" or "*any* state"—and there is no doubt that "*the* state" to which the statute refers is the State of Minnesota. So far, so good, as Lindemer was employed by Polk County, and Polk County is a political subdivision of the State of Minnesota.[13]

Unfortunately for Lindemer, however, the statute protects only those state employees who "engage[] in active service . . . in any of the military or naval forces of *the state* or of the United States . . . ." Minn. Stat. § 192.261, subd. 1 (emphasis added). Again, "the state" denotes a single state, and again, that single state is the State of Minnesota.[14] In short, the Minnesota Legislature chose to protect state employees who engage in active service in the *Minnesota* National Guard, but not state employees who

---

[13] The statute protects "employee[s] of the state or of any political subdivision, municipal corporation, or other public agency of the state." Minn. Stat. § 192.261, subd. 1. For ease of reference, the Court simply refers to Lindemer as an employee of the state.

[14] "'Conflicting interpretations of the same word' in the same context are not favored." *Wilbur v. State Farm Mut. Auto. Ins. Co.*, 892 N.W.2d 521, 524 (Minn. 2017) (citations omitted). Moreover, the Court's reading of "the state" to mean the State of Minnesota is bolstered by subdivision six of the statute, which provides protections for non-public employees who engage in active military service "declared by the proper authority of *any* state[.]" Minn. Stat. § 192.261, subd. 6 (emphasis added). It is apparent that the legislature used "the state" to mean "the State of Minnesota" and "any state" to mean "any of the 50 states."

engage in active service in the National Guard of another state.  Lindemer served in the

North Dakota National Guard, and thus she is not protected by § 192.261.

The Court takes no pleasure in dismissing Lindemer's claim under § 192.261.

Servicemembers are commonly left without job protection if they serve in the National

Guard of one state, but are employed by the government of another state.  If called to

state active service, these individuals are not protected by federal law (which covers

only *federal* military service) and often are not protected by state law (which generally

protects only those who serve in the National Guard of the employing state).[15]  The

Minnesota Legislature may someday fill this gap in the coverage of § 192.261.  In the

meantime, however, the Court must "apply the law as written by the legislature."  *Int'l

Bhd. of Elec. Workers, Local No. 292 v. City of St. Cloud*, 765 N.W.2d 64, 68 (Minn. 2009).

Lindemer's claim under § 192.261 is therefore dismissed.

---

[15]*See, e.g.*, Samuel F. Wright, *USERRA and SSCRA Coverage for National Guard Members*, Reserve Organization of America Law Review, No. 45, June 2002, available at https://cdn.ymaws.com/www.roa.org/resource/resmgr/LawReviews/1-206/045-LR.pdf, (describing how an individual who worked in Oregon but served in the Washington National Guard was not protected under federal law because he was involved in state service, and also was not protected under Oregon law because he served in the Washington National Guard); *see also* Konrad S. Lee et al., *Emerging Limits of the Uniformed Services Employment and Reemployment Act*, 55 Loy. L. Rev. 23, 30–33 (2009) (discussing how federal law does not protect members of the National Guard called to state duty and identifying some of the limitations of state laws that are intended to protect such servicemembers).

2.  Minn. Stat. § 192.34

Lindemer also sues under Minn. Stat. § 192.34, which makes it a crime to fire an employee because of the employee's "membership in the military or naval forces of the United States, of this state, or any other state[.]"  Putting aside the fact that Lindemer has virtually no evidence that she was fired because she served in the North Dakota National Guard, the Court dismisses her claim because § 192.34 does not provide a private cause of action.

"A statute does not give rise to a civil cause of action unless the language of the statute is explicit or it can be determined by clear implication." *Becker v. Mayo Found.*, 737 N.W.2d 200, 207 (Minn. 2007) (citation omitted).  The Minnesota Supreme Court has cautioned that "[p]rinciples of judicial restraint preclude [courts] from creating a new statutory cause of action that does not exist at common law where the legislature has not either by the statute's express terms or by implication provided for civil tort liability." *Bruegger v. Faribault Cty. Sheriff's Dep't*, 497 N.W.2d 260, 262 (Minn. 1993) (citations omitted).

Here, § 192.34 does not provide a private cause of action either "explicit[ly]" or "by clear implication."  *Becker*, 737 N.W.2d at 207.  "'[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it.'"  *Becker*, 737 N.W.2d at 207

(quoting *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979)).

Section 192.34 expressly provides that a violation of the statute is punishable as a crime.

The Minnesota Legislature knows how to create both criminal and civil liability.  In fact,

the legislature provided both criminal and civil remedies for violations of Minn. Stat.

§ 192.32, a closely related provision of the state's military code.  Section 192.32 forbids

discrimination against military personnel with respect to public accommodations or

services.  Violation of the statute is a misdemeanor, and the legislature also provided a

private cause of action.  *See* Minn. Stat. § 192.32; Minn. Stat. § 192.33.

Like § 192.32, § 192.34 explicitly imposes criminal liability on violators; unlike

§ 192.32, though, § 192.34 does not also create a private cause of action.  Because the

Minnesota Legislature did not provide both criminal and civil liability for violations of

§ 192.34—even though the Minnesota Legislature did provide both criminal and civil

liability for violations of § 192.32—the Court finds that § 192.34 does not provide a

private cause of action.  *See, e.g., Graphic Commc'ns Local 1B Health & Welfare Fund "A" v.

CVS Caremark Corp.*, 850 N.W.2d 682, 690–92 (Minn. 2014) (finding that "the Legislature

did not intend" a private cause of action in a statute which did not expressly provide

one, which had other enforcement mechanisms, and which had a nearby provision that

did expressly provide a private cause of action); *Becker*, 737 N.W.2d at 208–09 (finding

that a statute that explicitly imposed criminal, but not civil, liability, and that had

adjacent statutory provisions that explicitly imposed civil liability, was "unambiguous," as it was clear "that the legislature chose to impose criminal, but not civil, penalties" on individuals who violated the statute).

For that reason, Lindemer's claim under Minn. Stat. § 192.34 is dismissed.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.  Defendants' motion for summary judgment [ECF No. 19] is GRANTED IN PART and DENIED IN PART.

    a.  The motion is DENIED as to plaintiff's claims alleging that defendant Polk County violated Title VII, the MHRA, the FMLA, and the MWA.

    b.  The motion is GRANTED as to plaintiff's claims alleging that defendant Polk County violated Minnesota Statutes § 192.261 and § 192.34.  Those claims are DISMISSED WITH PREJUDICE AND ON THE MERITS.

2.  Defendant Polk County Social Services is DISMISSED from the case.

Dated:  August 7, 2020                    s/Patrick J. Schiltz
                                          Patrick J. Schiltz
                                          United States District Judge